ZANDER, Appellant, vs. HOLLY, Respondent.

*May 7—June 26, 1957.*

302

304

306

For the appellant there were briefs by *Marshutz, Hoffman & Hallows,* attorneys, and *Ellis R. Herbon* of counsel, and oral argument by *Mr. Herbon* and by *Mr. Donald M. Gorectke,* all of Milwaukee.

For the respondent there was a brief and oral argument by *B. R. Perrigo* and *John L. Newman,* both of Milwaukee.

BROADFOOT, J. This case requires the determination of the validity of gifts of three different kinds of personal property: The automobile, a tangible chattel; the bank accounts; and corporate stock.

In dealing with the rights of the parties in the automobile the trial court stated that the plaintiff purchased the same with her own funds in March, 1949, and that in authorizing the certificate of title to be issued in the names of herself and the defendant she intended to create a joint tenancy. The record discloses that after the commencement of the action the defendant, by court order, was required to sign the necessary documents to complete the sale of the car, and the proceeds are deposited in court.

It is unnecessary to decide whether or not the aunt intended to and did create a joint tenancy. The certificate of title is not in evidence and all the record discloses is that the certificate of registration was in both names. If a joint tenancy was created, the sale of the automobile resulted in a severance, and each party is entitled to one half of the proceeds. The same result is reached if there was a tenancy in common. In the final judgment to be entered in this case provision should be made for the division of the funds on

deposit with the court and each of the parties is entitled to one half thereof.

So far as the joint bank accounts are concerned this court has only dealt with the rights of survivors after the death of the donor. Prior to 1935 no completed gift of a joint bank account or certificate of deposit was recognized in this state unless there was delivery of the certificate of deposit or savings account book issued in the joint names. In that year in *Estate of Staver,* 218 Wis. 114, 260 N. W. 655, it was determined to adopt the contract theory in effect in Massachusetts and some other states. In the *Staver Case* this court said (p. 119):

"In case of joint bank accounts evidenced by certificates of deposit, the chose in action or contract claimed against the bank is at the outset created not only in the depositor but in the person whom he designates as joint payee or owner of the deposit. The delivery of the certificates or passbook which gives vitality and existence to the chose in action must create a legal interest and ownership both in the depositor and the third person directly."

No question of the rights of the two named depositors arose or was decided in that case. The issue was the right of the donee named on the certificates of deposit as against the executor of the donor's will, and the language that the instrument created a legal interest in the donee directly referred entirely to the right of survivorship.

In *Department of Taxation v. Berry,* 258 Wis. 544, 46 N. W. (2d) 757, a husband transferred four bank accounts made with his own funds to the joint names of himself and his wife. No gift-tax return was filed in respect to those accounts. The department of taxation made an assessment of gift tax against the wife following the death of her husband. The trial court determined that no gift had been made because by virtue of sec. 221.45, Stats., the husband had the right to withdraw any or all of the funds, as did the wife.

The transfer was revocable. The husband did not part with control of the accounts and therefore no gift was made. This court affirmed. Although the issue involved in that case is different from the present one it recognized that the mere form of the deposits in the records of the bank did not determine the actual rights of the parties.

In *Kelberger v. First Federal Savings & Loan Asso.* 270 Wis. 434, 71 N. W. (2d) 257, it was stated that the determination of the depositor's intent is the crux of the entire matter.

There is an annotation in 161 A. L. R. 71, entitled "Power of one party to joint bank account to terminate the interests of the other." From this annotation and from A. L. R. Blue Book of Supplemental Decisions we have found and examined many cases in other jurisdictions. We have been unable to find any case decided by this court in which the rights of two named depositors during the lifetime of each were determined. Accordingly we have had to look to decisions in other states.

The case most similar in its facts is the case of *Esling v. City Nat. Bank & Trust Co.* 278 Mich. 571, 270 N. W. 791. In that case a depositor had a savings account of $2,000 in the defendant bank. The plaintiff was a granddaughter of the depositor. The grandmother and the granddaughter went to the bank and transferred that amount from the individual account of the grandmother to the joint account of the two. Both signed signature cards similar to those used in our case. In addition, Michigan had a statute which stated in substance that when a deposit is made in any bank or trust company by any person in the name of such depositor and any other person and in form to be paid to either or the survivor of them, the account with any additions shall become the property of such persons as joint tenants. The granddaughter got possession of the bankbook and announced to her grandmother that she was going to the bank to withdraw the money. While the granddaughter was on

her way to the bank the grandmother, through another, telephoned the bank and ordered payment to be made only upon her signature. The granddaughter arrived at the bank, presented the book, and demanded payment of the deposit. She was informed of the grandmother's stop order, and payment was refused. Later the same day the grandmother came to the bank, withdrew the funds, and redeposited them in an account standing in her individual name. The granddaughter commenced suit against the bank. Judgment was entered for the defendant. The grandmother died after the commencement of the action but before trial. In that case the Michigan court said (p. 576) :

"However, the testimony discloses facts which tend to negative an intent on the part of Mrs. Lewis that by opening an account in the joint names of herself and her granddaughter she was to release her right to, and control of, the money deposited. She was well advanced in years, enfeebled in health, and it was fair to assume that her necessities might require the use of this deposit in whole or in part. Obviously with this in mind Mrs. Lewis reserved the right to withdraw from this account. The undisputed testimony is that the money placed in this joint account belonged to Mrs. Lewis and the bank was aware of such being the fact. And further, both by plaintiff's own statement and by the order to stop, the bank knew Mrs. Lewis was opposed to payment being made to plaintiff. But assuming plaintiff, as well as Mrs. Lewis, could make withdrawals, the rights of plaintiff in this joint deposit during the lifetime of Mrs. Lewis are, under the facts of this case, rather definitely settled by former decisions of this court as well as those of other jurisdictions."

In that case the court quoted from an opinion by Mr. Judge CARDOZO in *Moskowitz v. Marrow*, 251 N. Y. 380, 396, 397, 399, 167 N. E. 506, 511, 66 A. L. R. 870, where it was stated:

"The statute, as I view it, does not mean that between the persons named as depositors a joint tenancy ensues at once and automatically, as an irrebuttable presumption, with the result that neither will be permitted even during the joint

lives to prove against the other that the deposit was made with a contrary intention. For the bank which has paid, the form of the account is, indeed, an absolute protection, unless written notice has been given by either one of the depositors (cf., Banking Law, secs. 148, 198) 'not to pay such deposit in accordance with the terms thereof.' For the depositors themselves, the form is not conclusive in any contest during their joint lives as to the title to the moneys, nor conclusive after the death of either as to moneys then withdrawn. . . .

"The plain implication is that as between the depositors themselves, the form of the deposit gives rise to a presumption and nothing more. . . .

"It [the bank] is protected in the absence of written notice that it is 'not to pay such deposit in accordance with the terms thereof.' When such a notice is given and a contest in the courts ensues during the joint lives of the depositors, distribution is to be determined, not solely by the terms of the deposit, which then cease to be conclusive, but by the realities of ownership."

We have checked later decisions in both New York and Michigan and find that the rule announced has not been changed. The same quotation from Mr. Judge CARDOZO's opinion was relied upon in the case of *Cashman v. Mason* (4th Cir.), 72 Fed. Supp. 487, decided under the law of Minnesota. In the same case the opinion cited the *Esling Case* from Michigan. Also cited was *McLeod v. Hennepin County Savings Bank,* 145 Minn. 299, 300, 176 N. W. 987. In the latter case the following statement was signed by the joint depositors on the books of the bank:

"This account is our joint property, and is payable on the individual receipt of either of us, and in case of death of either, to the survivor."

The court therein concluded that the joint form of the deposit was but one of the factors to be considered in determining whether there was a donative intent. Upon that point the court said that the intent does not rest alone upon the joint form of the deposit.

In determining the validity of any gift of an interest in a bank account, the first element to be determined is an intention on the part of the donor to give. The plaintiff insisted throughout the trial that the transactions in 1951 were intended to take effect at her death. The defendant testified as to the plaintiff's intent based upon their conversations both before and after the transfers. Excerpts from the defendant's testimony follow:

"*A.* It was agreed that if I were to return and live there, as a surety or guarantee or protection, or whatever you want to call it, my aunt was not going to sell the property. I was to have a home, my father was to be in the home with me and she was going to live there and I wasn't going to be told one day it was my home and the next day it wasn't my home.

"*Q.* Well, now, how long was this arrangement supposed to go on under the agreement you speak of? *A.* There was no termination specified. . . .

"*Q.* Well, can you tell me what the arrangement was with respect to having your name placed on these items? *A.* It was protection to me that my aunt couldn't remove me from the premises. . . .

"*Q.* Do you make any claim against your aunt at this time? *A.* No.

"*Q.* You don't make any claim against any of these bank deposits? *A.* No. . . .

"*Q.* Let's rephrase the question in this way: Do you claim that you are the present owner of any part of these shares of A. T. & T. stock? *A.* I might, a joint tenant.

"*Q.* Do you claim that you're entitled to a share of the dividends of this A. T. & T. stock? *A.* No.

"*Q.* Did you have an understanding with your aunt as to when you would be entitled to the dividends from the A. T. & T. stock? *A.* No.

"*Q.* Was it your understanding with your aunt that you would ever be entitled to the dividends from the A. T. & T. stock during his lifetime—her lifetime? *A.* It was never discussed.

"*Q*. Do you claim that you have any right to the dividends of the A. T. & T. stock during your aunt's lifetime? *A*. No.
. . .

"*Q*. Do you claim the right to make withdrawals from any of these savings accounts, including the one at the Telco Union, under your own name, during your aunt's lifetime? *A*. I would with her instructions.

"*Q*. But only with her instructions? *A*. It's very evident that I haven't touched a penny.

"*Q*. And you wouldn't feel entitled to without her instructions? *A*. I certainly would not. I would ask her first.
. . .

"*Q*. Will you tell us now in your own words how it came about that your name was placed on these accounts and on the stock and on the government bonds? *A*. My aunt sold the home and she hadn't told me about it . . . and I asked for protection in the amount of $15,000 as survivor only.
. . .

"*Q*. But that's what you requested of your aunt? *A*. Yes, on a survivorship basis. The instruments were to be passed to me on a survivorship basis. . . .

"*Q*. It is your understanding that you have no interest in any of these items except upon your aunt's death? *A*. Yes."

Most of the testimony quoted was given by the defendant at an adverse examination before trial. It is true that she modified those statements and claimed further rights during the course of the trial. In addition to the defendant's testimony the following circumstances appear in the record:

The defendant never attempted to withdraw any of the funds. When dividend checks were received she indorsed the same, gave them to her aunt who cashed them and kept the money. The plaintiff drew the interest on the savings accounts. No part of the dividends or interest was reported by the defendant in her income-tax returns. No gift-tax returns were filed.

In addition to the above testimony and the conduct of the defendant we have the same circumstances emphasized

in the *Esling Case, supra.* The plaintiff was well advanced in years and enfeebled in health. We must assume here, as did the court in the *Esling Case,* that plaintiff's necessities might require the use of her assets in full or in part, and that the plaintiff reserved the right to control the bank accounts during her lifetime.

Upon the trial neither the parties nor the court seemed to give consideration to the fact that different types of personal property were involved. The trial court determined that the plaintiff intended to create an immediate interest in the defendant as a joint tenant by each of the transfers. In its memorandum decision the trial court said:

"Laura firmly insisted at the trial that said transfers were intended to take effect at her death. However, once the transfers were effected with the respective depositors, Mildred obtained a present legal right. Furthermore, as to the bank accounts, Laura recognized this legal right in Mildred by not withdrawing any money from the account except interest. The only money withdrawn was in January of 1952, when moneys were taken from the joint account at the First Wisconsin National Bank to purchase 21 A. T. & T. stock shares, also held *jointly* by the parties. By thusly purchasing these shares, Laura demonstrated most clearly that the transfers of August, 1951, were intended to convey a present interest. If they were to take effect upon her death, why did not Laura place these 21 shares in her name alone?"

The question at the end of the quotation illustrates the thinking of the trial judge. If the plaintiff had placed the 21 shares of stock referred to in her own name the defendant would have had no legal interest, even of survivorship. It is apparent that the trial judge paid too much attention to the form of the deposit agreements and not enough to the controlling tests.

So far as the bank deposits are concerned, we cannot agree with the trial court that it was the intention of the donor to create a true joint tenancy. That finding is against the

great weight and clear preponderance of the evidence. It is clear from the record that both parties assumed that a survivorship was being created. In the agreement with the bank the donor expressly reserved the right to withdraw the funds. It is true that the donee had the same right if she presented the savings bankbook to the bank. As stated by Mr. Judge CARDOZO we must give effect to "the realities of ownership." We hold, therefore, that the plaintiff had a full right to withdraw the amounts in the savings accounts in the two banks. The counterclaim must be dismissed.

In considering the rights of the parties in the various stock certificates we are faced with different problems. In our research we have found several annotations dealing with the gift of stock certificates and the creation of joint tenancies. 99 A. L. R. 1077, 121 A. L. R. 426, 153 A. L. R. 934, and 44 A. L. R. (2d) 595. At common law joint tenancy could be created in personal property and, except where modified by statute, the common-law rules for the creation of joint tenancy still prevail. At common law the basic requirement for the creation of joint tenancy was that the four unities be present. These were unity of interest, unity of title, unity of time, and unity of possession. *Estate of Gabler,* 265 Wis. 126, 60 N. W. (2d) 720, 61 N. W. (2d) 823; *Breitenbach v. Schoen,* 183 Wis. 589, 198 N. W. 622. In the *Breitenbach Case* this court said (p. 592):

"Manifestly, the deceased could not convey an interest in the certificates to herself, and it is quite clear that she did not intend to convey the entire interest in the certificates to her son. Not being able to make a conveyance to herself, there was neither unity of title nor unity of time, and under such circumstances a tenancy in common was created rather than a joint tenancy."

The case of *Hass v. Hass,* 248 Wis. 212, 21 N. W. (2d) 398, 22 N. W. (2d) 151, although not dealing with a gift of

stock certificates, contains a rule that is applicable to one of the situations presented here. In that case the court was dealing with a conveyance by deed from Bertha Hass to herself and Herbert W. Hass, her son, and the survivor of them in his or her own right. Both real estate and personal property were conveyed by the deed. The granting· clause purported to convey to the grantees a life estate as joint tenants during their joint lives and an absolute fee forever in the remainder to the survivor of them. Following the description, the purpose of the instrument was stated to be to vest title in the property in the grantees therein named as joint tenants and none other. The court held that the deed could not operate to convey any interest or estate from the grantor to herself but it was still effective to convey an interest in the property to the son. A joint tenancy was not created for the reason that the unities of time and title were absent. However, the court held that the conveyance created a tenancy in common during their joint lives with the survivor to take the remainder in fee. The court said (p. 221):

"It is clear from the language of the deed that the conveyance was intended to create a tenancy for the joint lives of the parties with the remainder in the survivor. That it created a tenancy in common rather than a joint tenancy is also beyond question. We see no reason why this type of survivorship may not be created by deed. It has one advantage over the right of survivorship incident to joint tenancy, it cannot be destroyed by the act of one of the parties. A conveyance by one joint tenant of his interest in the property destroys the right of survivorship."

Most of the opinion was devoted to title to the real estate. However, the court held that the right of the son to the personal property was governed by the same considerations as applied to the realty and that upon the death of the mother the son became the sole owner of the personalty described in

the deed. On motion for rehearing a memorandum was filed in which the court explained what was meant by "survivorship" and stated that (p. 224a), "perhaps it would be more accurate to say that such an instrument creates an indestructible remainder rather than a type of survivorship."

So far as the 29 shares of A. T. & T. stock owned by the plaintiff and transferred to the names of herself and the defendant as joint tenants with full rights of survivorship are concerned, it is clear that no joint tenancy therein was created because there was neither unity of title nor unity of time, and under the circumstances a tenancy in common was created rather than a joint tenancy with, however, the type of survivorship or indestructible remainder in the survivor that is described in the *Hass Case.*

We have a different situation with respect to the 21 shares purchased thereafter in the names of the parties as joint tenants. In that situation the four unities are present and a joint tenancy with right of survivorship was created. Many states, including Wisconsin, have enacted the Uniform Stock Transfer Act, sec. 183.01 *et seq.,* Stats. In the states that have adopted that act it is held that there is a complete gift of corporate stock where the certificate has been transferred at the direction of the owner to the donee on the books of the corporation and a new certificate issued in the name of the donee or where a certificate is issued in the first instance in the name of the donee although the certificate so issued is retained by the donor and not delivered to the donee. These decisions obviate proof of delivery. This question was considered in *Estate of Heller,* 210 Wis. 474, 246 N. W. 683. Our court there said (p. 481):

"If the present proceeding involved a transfer of stock issued to Mr. Heller and delivered by him to the corporation for transfer and reissue to the members of his family without delivery of such certificate to the transferees, we would have

to hold that sec. 183.01, Stats., is controlling. That section provides among other things as follows:

" 'Title to a certificate and to the shares represented thereby can be transferred only:

" '(a) By delivery of the certificate indorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby; or

" '(b) By delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign, or transfer the same or the shares represented thereby, signed by the person appearing by the certificate to be the owner of the shares represented thereby. Such assignment or power of attorney may be either in blank or to a specified person.' "

The above quotation was dicta but it does call attention to the Uniform Stock Transfer Act which was then and is now the law in Wisconsin. We hold, therefore, that by compliance with the Uniform Stock Transfer Act there was sufficient delivery of the shares of stock.

As to the certificate for the 29 shares of the A. T. & T. stock the record makes it clear that the plaintiff intended to and did reserve the income therefrom during her lifetime. In Wisconsin a reservation of interest or dividends during the donor's life does not destroy a gift nor militate against an actual change of title. *McNally v. McAndrews,* 98 Wis. 62, 73 N. W. 315; *Pirie v. Le Saulnier,* 161 Wis. 503, 154 N. W. 993; *Estate of Merrill,* 196 Wis. 351, 220 N. W. 215; *Estate of Duwe,* 229 Wis. 115, 281 N. W. 669.

Since a true joint tenancy was created in the 21 shares of A. T. & T. stock any attempted reservation of the income by the plaintiff would be inconsistent with the nature of the joint tenancy, unless expressly reserved upon the stock certificate itself or by written instructions filed with the corporation. The purpose of the Uniform Stock Transfer Act is to make certificates of stock negotiable and to invest the

certificates themselves with many of the incidents of tangible personal property. Therefore we are forced to conclude that each of the parties is entitled to one half of the dividends from the 21 shares of A. T. & T. stock.

In the case of plaintiff's investment of $2,000 in the Telco Credit Union, the record is not clear as to just what transpired. The complaint refers to it as a "deposit." The court referred to it as an "account" and placed it on a par with bank accounts. Ch. 186, Stats., provides for the incorporation and conduct of credit unions. It is true they are subject to the examination and supervision of the banking department, but there is no provision for a credit union receiving deposits. Credit unions sell shares of stock. The record does not disclose whether any shares of stock were ever issued to the plaintiff, nor does it appear that her stock certificates, if issued, were surrendered to the credit union and reissued in both names as provided by the Uniform Stock Transfer Act. The mere signing of the card referred to in the statement of facts would not, under the circumstances, create a joint tenancy. Further proceedings will have to be held in the trial court so that all of the facts can be presented and the trial court can then make appropriate findings of fact and conclusions of law and reflect the same in the judgment to be entered.

The complaint said nothing about the government bonds nor does the judgment make mention of them. Although the question of government bonds was not put in issue by the pleadings it received the attention of the court. Under the circumstances we cannot make any determination as to the bonds. There is an annotation in 40 A. L. R. (2d) 788, dealing with the subject that will be helpful if there is an amendment of the pleadings after the record is remanded and the rights of the parties in the government bonds become an issue.

Because of the result of our consideration of the appeal from the judgment we find it unnecessary to consider the question of the appeal from the order.

*By the Court.*—Judgment and order reversed. Cause remanded with directions for further proceedings in conformity with this opinion.